### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| MED-IM DEVELOPMENT, INC., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-07-1618 |
| | § | |
| GENERAL ELECTRIC CAPITAL CORP,. | § | |
| *et al.*, | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM AND ORDER

This lawsuit arises out of the sale and financing of specialized medical equipment. Med-IM, a provider of medical imaging services, located in Montgomery County, Texas, purchased the equipment from General Electric Medical Systems Information Technologies ("GEMSIT"), through a contract that contained an arbitration clause. Med-IM obtained financing from General Electric Healthcare Financial Services and General Electric Capital Corporation (together, "GECC"), through a financing agreement that did not contain an arbitration clause. Med-IM and five entities or individuals who signed guarantee agreements with GECC sued both GEMSIT and GECC in Texas state court, alleging that the medical equipment failed to perform as promised and asserting state-law damages claims for breach of contract, breach of express and implied warranty, fraud and fraudulent inducement, negligent misrepresentation, and seeking a declaratory judgment. The defendants timely removed. GECC asserted counterclaims against Med-IM for breach of contract for failing

to comply with its payment obligations under the financing agreement and against the guarantors for breach of contract for refusing to pay the amounts due as a result of Med-IM's failure to make payments.

GEMSIT moved to compel arbitration with Med-IM under the parties' contract. Med-IM initially opposed GEMSIT's motion to compel, then withdrew its opposition. Med-IM did, however, move to compel GECC to participate in the arbitration as well as GEMSIT, despite the absence of an arbitration clause in the financing agreement with GECC. (Docket Entry No. 30). In the alternative, Med-IM sought to stay the litigation with GECC pending the resolution of the arbitration with GEMSIT. (Docket Entry No. 35).

Based on the pleadings, the motions and responses, the record, the arguments of counsel presented at an oral hearing, and the applicable law, this court denies Med-IM's motion to compel GECC to participate in the arbitration with GEMSIT. This court grants Med-IM's motion to stay the litigation of the claims asserted against GECC (and counterclaims) pending the related arbitration with GEMSIT. The stay is granted as a matter of this court's discretion to manage its docket, not because the stay is mandatory under the Federal Arbitration Act, 9 U.S.C. § 3. The reasons for these rulings are explained in detail below.

## I.      Background

On August 9, 2002, Med-IM sent a Request for Proposal to several medical equipment providers for a piece of medical equipment known as a Picture Archive Communications System and Radiology Information System ("PACS/RIS"). (Docket Entry No. 30, Ex. B at

2

1).  In September 2002 and December 2002, Med-IM and GEMSIT representatives met to discuss the purchase of the equipment.  (*Id.*, Ex. B at 2).  Med-IM asserts that it specifically communicated to the GEMSIT representatives that it was only interested in purchasing a complete package consisting of equipment, maintenance, and financing.  (*Id.*).  Med-IM asserts that in these meetings, a GECC representative became "intimately involved in discussions regarding GE providing Med-IM with this package."  (*Id.*).  According to Med-IM, GECC representative Greg Pinchback and GEMSIT representatives Joseph Zegarelli and Michael Adams together made specific representations to Med-IM vice-president David Brooks in meetings and in other communications that "GE" was a "single provider capable of meeting" Med-IM's needs and that "GE" would "provide a turnkey PACS/RIS system that would meet all the functionality and modalities requested by Med-IM in its RFP."  (*Id.*, Ex. B at 2–3).  Med-IM asserts that it informed GEMSIT and GECC that Med-IM would not enter the transaction unless "GE" acted as one provider to implement the system and to solve any performance problems.  Med-IM asserts that GECC agreed to this condition.  (*Id.*).  Med-IM asserts that a GEMSIT representative worked directly with Med-IM on financing and informed Med-IM that the equipment price could be adjusted if Med-IM was not satisfied with GECC's financing offer.  (*Id.*, Ex. B at 3).  Med-IM asserts that GEMSIT representatives made specific representations about the functionality of the equipment and that the equipment would perform as requested in the RFP and as described in the sales literature, and that the GECC representative specifically affirmed these statements.  (*Id.*, Ex. B at 2).

Med-IM signed separate agreements with GEMSIT and GECC.  The sales agreement with GEMSIT, entitled "Terms and Conditions for GE Medical Systems Information Technologies Products," contained an arbitration clause, a description of the equipment, warranty information, an integration clause, and a "governing law" provision stating that "[t]he Agreement and the rights and obligations of the parties thereunder shall be governed by and construed in accordance with the laws of the State where the system is installed, without regard to the conflicts of law principles thereof."  (Docket Entry No. 30, Ex. C at 1, 3–5, 7–8).  The arbitration clause stated that "[a]ny claim or controversy arising out of or relating to the Agreement must be submitted" to arbitration.  (*Id.*, Ex. C at 7).  The sales agreement included a "Project Price and Payment Terms" section stating that "[i]n consideration for GEMS IT providing the System and Services to Customer, Customer shall pay the amounts set forth in Exhibit 5."  (*Id.*, Ex. C at 3).  Exhibit 5 to the sales agreement, entitled "Project Price and Payment Terms," stated that the price "shall be as stated in the Quotation."  (*Id.*, Ex. C at 17).  The sales agreement was not dated, but Med-IM states that the agreement to purchase the equipment was reached in March 2003.  GEMSIT provided quotations to Med-IM on December 18, 2002 and December 30, 2002.  Each quotation set out the purchase price, payment terms, and delivery terms for the equipment.  Neither quotation mentioned GECC.  The quotations were both signed by a Med-IM representative. (Docket Entry No. 36, Exs. N, O).

The financing agreement, entitled the "Master Security Agreement," was dated May 30, 2003 and was signed by Med-IM, the "Debtor," and GECC, the "Secured Party."

4

(Docket Entry No. 30, Ex. D).  The financing agreement did not contain an arbitration agreement.  A choice-of-law provision specified New York law.  (*Id.*, Ex. D at 4).  The financing agreement "contains the general terms that apply to the financing of Equipment" and stated that the "Secured Party agrees to finance Debtor's purchase of the equipment ('Equipment').  All units of Equipment . . . are further described in any Schedule signed by both parties."  (*Id.*, Ex. D at 1).

Med-IM and GECC signed three separate equipment schedules, each setting out the specific loan amounts and repayment schedules for loans made to finance the purchase of three separate pieces of equipment.  (Docket Entry No. 30, Ex. D at 6–15).  All three equipment schedules were entitled "Equipment Schedule Dated as of 6/03/2003 to Master Security Agreement Dated as of 5/30/2003."  (*Id.*).  Each equipment schedule stated that "[s]ubject to the terms and conditions of the Agreement, Secured Party agrees in the case of GE Equipment to sell to Debtor, and in the case of non-GE equipment to finance Debtor's purchase of, the Equipment described below (the 'Equipment')."  (*Id.*).  One schedule pertained to a loan for the purchase of the "GE Medical PACS System," and another pertained to a loan for the purchase of the "GE RIS System."  (*Id.*, Ex. D at 6–13).  The third schedule pertained to a loan for the purchase of a computer server and hardware for the GE RIS System from Dell Computer Corp.  (*Id.*, Ex. D at 14–15).

In September and October 2003, Kingsland Open MRI, L.P., C.A.T. Scan Centre, Inc.

("CSC"), Woodstead MRI, Inc., Fallbrook Open MRI, Inc., Southwest MRI, Inc.,[1] and Cornelius R. Wheeler each signed separate agreements guaranteeing the loan made by GECC to Med-IM.  Kingsland, CSC, Southwest, Woodstead, and Fallbrook were related companies that operate MRI centers in Houston. Wheeler was the president of Med-IM.

Med-IM stopped making repayments on the GECC loan in November 2006.  In March 2007, GECC notified Med-IM and the guarantors that Med-IM had defaulted under the financing agreement by failing to make its scheduled payments.  GECC demanded payment. Med-IM and the guarantors filed this suit on April 5, 2007, alleging that GEMSIT had failed to deliver the complete medical system that was purchased and that the medical equipment failed to perform as promised.  Med-IM and the guarantors sought a declaratory judgment that they are not liable for any amounts due under the financing or sales contracts relating to or arising from the PACS/RIS transactions and sought damages caused by the alleged breach of contract and warranties, fraudulent acts, and negligent misrepresentations.   In its counterclaim asserting breach of contract claims for Med-IM's failure to make payments and the guarantors' failure to pay under their obligations, GECC sought  the amounts due under the terms of the financing and guaranty agreements.

Following removal, the parties filed the pending motions raising the relationship of the arbitrable claims to the litigation.

## II.    Med-IM's Motion to Compel GECC to Arbitrate

---

[1]Southwest is not a named plaintiff but is named in GECC's counterclaim.

It is clear that the disputes between Med-IM and GEMSIT must be arbitrated and that the litigation between these parties must be stayed. Section 3 of the Federal Arbitration Act requires a stay of litigation on "any issue referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3. Med-IM argues that although the financing contract it signed with GECC does not contain an arbitration agreement, GECC should be compelled to participate in the arbitration between Med-IM and GEMSIT. Med-IM argues that the sales agreement with GEMSIT, which contains an arbitration clause, and the financing agreement with GECC, which does not contain an arbitration clause, must be read together as a single agreement. Alternatively, Med-IM argues that GECC should be required to arbitrate under direct-benefits estoppel. (Docket Entry No. 30). GECC responds that the sales and financing contracts are separate and independent contracts and that direct-benefits estoppel does not apply as a basis to compel it to arbitrate in the absence of an agreement to do so. (Docket Entry No. 36).

The duty to arbitrate is one of contract; a court cannot compel parties to arbitrate issues they have not agreed to submit to arbitration. *Tittle v. Enron Corp.*, 463 F.3d 410, 418 (5th Cir. 2006). "The purpose of the FAA is to give arbitration agreements the same force and effect as other contracts – no more and no less." *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004). Federal courts asked to compel arbitration generally apply state law on contract formation and validity to determine whether contracting parties agreed to arbitrate a dispute. Federal courts often look to the federal law of arbitrability to determine whether a nonsignatory may be compelled to arbitration, but the cases are not

7

wholly consistent. *See In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738 (Tex. 2005); *Bailey*, 364 F.3d at 267–68 (applying federal law); *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 355–63 (5th Cir. 2003) (applying federal law); *Fleetwood Enters. v. Gaskamp*, 280 F.3d 1069, 1074–77 (5th Cir. 2002) (applying state law). This court examines the issue under both federal and state law.

### A.    Whether GECC can be Compelled to Arbitrate as a Signatory

Med-IM first contends that GECC should be treated as a signatory to the sales agreement containing the arbitration clause because the sales and financing agreements must be read together to form an enforceable contract. (Docket Entry No. 30 at 4–5). The basis for this argument is that the sales agreement does not contain terms regarding price, financing, or when the equipment would be delivered or installed. Med-IM points out that the sales contract states that it is to "apply to and govern the implementation of a GEMSIT product or system . . . , as described in the attached Quotation," but claims that there is no attached quotation. Med-IM asserts that the missing material terms are provided only in the financing agreement. (*Id.* at 5).

GECC has submitted copies of quotations that GEMSIT provided to Med-IM on December 18, 2002 and December 30, 2002. Each quotation sets out the purchase price, payment terms, and delivery terms for the equipment. The quotes are both signed by a Med-IM representative. (Docket Entry No. 36, Exs. N, O). Med-IM has not disputed this evidence. The argument that GECC is properly treated as a signatory to the sales agreement fails.

8

### B.      Whether GECC Can be Compelled to Arbitrate as a Nonsignatory

Med-IM relies on case law recognizing that under some circumstances, a nonsignatory may be compelled to arbitrate.  This argument is analyzed under both federal substantive law and under Texas law, where the equipment is installed.  The "governing law" provision in the sales agreement states that "[t]he Agreement and the rights and obligations of the parties thereunder shall be governed by and construed in accordance with the laws of the State where the system is installed, without regard to the conflicts of law principles thereof." (Docket Entry No. 30, Ex. C at 8).

An arbitration agreement can be enforced as to a nonsignatory only if the nonsignatory is bound by that agreement under recognized contract or agency principles.  *Bridas*, 345 F.3d at 356.  Those principles are incorporation by reference; assumption; agency; veil-piercing/alter ego; estoppel; and third-party beneficiary.  *Id.*  In this case, Med-IM invokes direct-benefits estoppel as the basis for requiring GECC to arbitrate.  Many of the direct-benefit estoppel cases involve a nonsignatory who sues under a contract containing an arbitration clause while refusing to be bound by that clause.  For example, in *Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, the court was asked to confirm an arbitration award in favor of Bridas against the Government of Turkmenistan arising out of a joint venture agreement that contained an arbitration clause.  The Government of Turkmenistan was not a signatory to the agreement.  The court declined to apply direct-benefits estoppel, noting that the nonsignatory had not sued the signatory under the joint venture agreement containing the arbitration clause and therefore had not "exploited" the

9

agreement to "the degree that the cases that consider applying this version of estoppel require." *Id.* at 362.

Other direct-benefit estoppel cases have not focused on whether the nonsignatory filed a suit or claim against the signatory based on the agreement containing the arbitration clause, but on whether the evidence showed that the nonsignatory received direct and substantial benefits from that agreement. In *DuPont,* 269 F.3d 187*,* the court considered a joint venture agreement between DuPont China and Rhodia Fiber, subsidiaries of DuPont and Rhodia respectively. DuPont, the parent company of DuPont China, sued Rhodia Fiber and Rhodia for breach of an oral agreement, not for breach of the joint venture agreement. The joint venture agreement contained an arbitration clause. The Third Circuit affirmed the district court's refusal to compel DuPont to arbitrate its claim against the signatories to the joint venture agreement. The court held that direct-benefits estoppel did not apply because there was no evidence that DuPont had "embraced the Agreement itself during the lifetime of the Agreement, or that it received any direct benefit under the Agreement." *Id*. The *DuPont* court did not limit direct-benefits estoppel to cases in which the nonsignatory had sued the signatory under the agreement containing the arbitration clause. *See also Hellenic Inv. Fund, Inc. v. Det Nortske Veritas*, 464 F.3d 514, 517–20 (5th Cir. 2006) (enforcing a forum-selection clause against a nonsignatory to the contract when the nonsignatory received direct and substantial benefits from the signatory's contract performance); *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999) (enforcing a forum-selection clause against nonsignatory to the contract because the nonsignatory received direct and

substantial benefits from the signatory's contract performance); *Zurich Am. Ins. Co. v. Watts Indus., Inc.,* 417 F.3d 682, 687–88 (7th Cir. 2005) (declining to enforce arbitration agreement against a nonsignatory based on direct-benefits estoppel because the nonsignatory had not sought to enforce any rights under the agreements containing the arbitration clause and any benefits available under those agreements were too attenuated and indirect to force arbitration under an estoppel theory); *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993) (a nonsignatory local affiliate sued for a declaratory judgment that it had a right to use a trade name; the authority to use the trade name was provided under an agreement containing an arbitration clause, which the court enforced against the nonsignatory because it had benefitted from using the trade name); *Wood v. PennTex Res., L.P.*, 458 F. Supp. 2d 355, 372–73 (S.D. Tex. 2006) (direct benefits estoppel applied to compel arbitration against a nonsignatory that had not sued the signatory but had received significant and direct benefits under the agreement containing the arbitration clause).

Texas law is similar. "[M]indful of the extensive body of federal precedent that has explored the extent to which non-signatories can be compelled to arbitrate," and recognizing "that it is important for federal and state law to be as consistent as possible in this area, because federal and state courts have concurrent jurisdiction to enforce the FAA," the Texas Supreme Court has established rules governing whether a non-signatory must arbitrate that are "informed by persuasive and well-reasoned federal precedent." *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005).  The Texas Supreme Court has held "that a

nonparty may be compelled to arbitrate 'if it seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provisions,'" and that "this rule is consistent with the federal law of 'direct benefits estoppel.'" *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 131 (Tex. 2005) (quoting *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d at 741). In *Weekley Homes,* the Texas Supreme Court held that under both Texas and federal law, a nonparty to an arbitration contract may be compelled to arbitrate if it asserts a claim that is based on the contract or if that nonparty "deliberately seeks and obtains substantial benefits from the contract itself" in other ways. *Id.* at 132. The Court articulated the basis of direct-benefits estoppel as follows: "when a nonparty consistently and knowingly insists that others treat it as a party, it cannot later 'turn [] its back on the portions of the contract, such as an arbitration clause, that it finds distasteful.' A nonparty cannot both have his contract and defeat it too." *Id*. at 135 (quoting *DuPont*, 269 F.3d at 200).

GECC has not sued under, or to enforce, the sales agreement. GECC's counterclaim against Med-IM and the individual guarantors seeks to enforce the financing agreement. To treat GECC as if it was a signatory to the sales contract would be to read the contracts as one, a result not supported by the law or the facts disclosed in the record. Although Med-IM contends that GECC played a significant role in the discussions about the equipment and the negotiations that led to both the sales agreement and the financing agreement, the sales agreement does not specifically refer to, or confer a direct and substantial benefit on, GECC. The sales agreement did not require Med-IM to finance the equipment through GECC. Med-IM states that it told GEMSIT and GECC that it wanted to arrange the sale and financing as

a package deal, but the sales agreement did not require this and GEMSIT did not require financing from GECC as a condition of the equipment sale. Med-IM was free to secure financing from any lender. The sales agreement between GEMSIT and Med-IM did not directly confer legal rights or benefits on GECC. *See Wood*, 458 F. Supp. 2d at 370–73; *Weekley Homes*, 180 S.W.3d at 132–34. The sales agreement benefitted GECC only indirectly by creating an opportunity for GECC to enter into a financing agreement with Med-IM. Direct-benefits estoppel does not apply to this case under either state or federal law.

Med-IM points out that the equipment schedules to the financing agreement state that "[s]ubject to the terms and conditions of the Agreement, Secured Party agrees in the case of GE Equipment to sell to Debtor, and in the case of non-GE equipment to finance Debtor's purchase of, the Equipment described below (the "Equipment"). (Docket Entry No. 30, Ex. D at 6–15). The sales agreement does not refer to GECC as a seller of the equipment. The statement was made in the context of the financing agreement, which "contains the general terms that apply to the financing of Equipment." (*Id.*, Ex. D at 1). The statement does not show that GECC obtained direct benefits from the sales contract. Med-IM appears to cite the statement as evidence that GECC and GEMSIT functioned as, and should be treated as, a single contracting entity, making GECC subject to the arbitration clause in the sales contract. This argument fails because the record does not provide a basis to find that GECC can be compelled to arbitrate under the "alter ego" doctrine.

"The corporate veil may be pierced to hold an alter ego liable for the commitments

13

of its instrumentality only if (1) the owner exercised complete control over the corporation with respect to the transaction at issue and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Bridas*, 345 F.3d at 359. Med-IM does not contend that the alter-ego doctrine applies in this case. Med-IM has not submitted evidence necessary to support such a contention, including evidence of: whether the corporate entities have common stock ownership, common directors or officers, common business departments, consolidated financial statements; whether one entity finances or caused the incorporation of the other; whether one entity operated with grossly inadequate capital; whether one entity pays the salaries or other expenses of the other entity; whether one entity receives no business except that given by the other; whether one entity uses the other's property as its own; whether the daily operations of the two entities are kept separate; whether there is an observance of corporate formalities; whether each entity's directors act in the primary and independent interest of their own company; whether others pay or guarantee debts of the dominated corporation; and whether the entities deal with each other at arm's length. *See id.* at 360 n.11. Although Med-IM claims that GEMSIT and GECC acted as a single entity, "GE," to provide a "package" consisting of equipment, maintenance, and financing, Med-IM concedes that the "GE" representatives it dealt with were affiliated with either GECC or GEMSIT. Med-IM has failed to present evidence of the corporate structure of GECC or GEMSIT and their relationship to one another. For the purpose of the motion to compel arbitration, Med-IM has failed to show that GECC and GEMSIT acted as a single corporate entity.

The motion to compel arbitration against GECC as a nonsignatory to the contract between GEMSIT and Med-IM is denied.

### III.  Med-IM's Motion to Stay the Litigation With GECC Pending the Arbitration with GEMSIT

As an alternative to compelling GECC to arbitrate, Med-IM asks this court to stay the litigation with GECC arising out of the sale and financing of the equipment pending resolution of its arbitration with GEMSIT.  (Docket Entry No. 35).  Section 3 of the FAA requires that a court stay litigation of "any issue referable to arbitration under an agreement in writing for such arbitration."  9 U.S.C. § 3.  If a mandatory stay under section 3 is not applicable, a court may still exercise its discretionary power to stay claims between nonarbitrating parties pending the outcome of arbitration as a means of controlling and managing the docket.  *See Complaint of Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 755 (5th Cir. 1993) (citing *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983)).

The Fifth Circuit has stated that generally, the mandatory stay provision of the FAA does not apply to those who are not parties to a written arbitration agreement.  *See Adams*., 237 F.3d at 540.  However, "the clarity of this rule denying the applicability of the mandatory stay provision to non-parties has been muddied" by recent cases.  *Id.*  In *Adams,* the court summarized these recent precedents:

> In *Harvey v. Joyce*, 199 F.3d 790 (5th Cir. 2000) and *Subway Equip. Leasing Corp. v. Forte*, 169 F.3d 324 (5th Cir. 1999), we applied the stay provision to non-parties because the issues presented in the nonparty-party litigation if litigated would have

15

> rendered the arbitration redundant and thwarted the federal
> policy favoring arbitration. . . .   In *Harvey* and *Subway*,
> however, we were confronted with exceptional circumstances.
> In *Harvey*, the parties to the arbitration agreement were all
> shareholders in a company, CTC, the non-party to the
> agreement.  Joyce, one of the parties to the agreement, had been
> named along with CTC as a defendant.  The allegations of the
> lawsuit against CTC were based upon actions taken by Joyce on
> behalf of CTC. . . . As a result, we found that allowing litigation
> to proceed could have "a critical impact in the Joyce
> arbitration."  Similarly, in *Subway*, we found that because the
> issues to be litigated by the non-parties were identical to the
> issues to be arbitrated by the parties allowing the litigation to
> proceed would harm the parties' rights to arbitrate.  Because of
> these exceptional circumstances, we diverged from our general
> rule requiring party status for the mandatory stay provision to
> apply, thereby creating tension in our case law.

*Id.* at 540–41 (internal citations omitted).   In *Adams*, the court held that because the

nonsignatory seeking a stay in that case did not show that allowing the litigation to proceed

would impede the arbitration, there were no "exceptional circumstances" justifying a

mandatory stay of the litigation under section 3.  Because the nonsignatory would only be

entitled to a discretionary stay, the denial of the stay was an interlocutory order over which

the appellate court lacked jurisdiction.  *Id.*

   Both sides cite *Hill v. GE Power Systems, Inc.,* 282 F.3d 343 (5th Cir. 2002).  In that

case, an energy company signed a memorandum of understanding with General Electric

Power Systems, Inc. to develop two power plants and a gas storage facility.  The energy

company later signed a termination agreement ending the memorandum of understanding.

The termination agreement contained an arbitration clause.  GECC had entered into a

separate agreement, which did not contain an arbitration clause, with the energy company

16

to serve as the financial advisor to the project.  The energy company brought identical claims against both General Electric Power Systems and GECC, alleging that they had conspired to withhold payments, stall financing, withhold information, and force the energy company to use certain equipment.  *Id.* at 345–46.  The district court granted General Electric Power Systems's motion to stay and compel arbitration but denied GECC's motion seeking the same relief because it was not a signatory to the agreement containing the arbitration clause. The Fifth Circuit reversed the denial of GECC's motion to stay.  The Fifth Circuit found that GECC was entitled to a mandatory stay under the FAA because the claims against GECC were "inherently inseparable" from the claims against General Electric Power Systems and permitting the suit "to go forward would undermine the arbitration proceedings."  *Id.* at 348.

In *Waste Management, Inc v. Residuos Industrials Multiquam*, 372 F.3d 339 (5th Cir. 2004), the Fifth Circuit synthesized the precedents identifying the factors for deciding when a nonsignatory can obtain a mandatory stay of litigation under section 3 pending arbitration:

> [S]everal factors emerge for invoking § 3 on the application of a non-signatory: 1) the arbitrated and litigated disputes must involve the same operative facts; 2) the claims asserted in the arbitration and litigation must be 'inherently inseparable'; and 3) the litigation must have a 'critical impact' on the arbitration.

*Id.* at 343.  In *Waste Management*, a signatory filed a lawsuit seeking contract damages from a nonsignatory.  The same contract damages were at issue in an arbitration between the plaintiff and another signatory to the arbitration contract.  *Id.* at 340–41.  The Fifth Circuit found that the signatory's claims in the litigation were so closely related to the arbitration and would have such an impact on the arbitration as to make a stay mandatory under section 3.

17

First, the major operative facts underlying the signatory's claims against the nonsignatory in the litigation were identical to those underlying the signatory's claims in the arbitration. Second, the signatory's claims in the arbitration and the litigation were inseparable because they sought to recover the same payment for a single alleged harm. Finally, allowing the litigation to proceed would "substantially impact" the arbitration because the arbitrator would be strongly influenced to follow the court's determination. *Id.* at 345.

The issue in this case is the relationship of the claims and counterclaims between Med-IM (and the guarantors) and GECC, which will be litigated, and the claims and counterclaims between GEMSIT and Med-IM, which will be arbitrated. The operative facts relating to the two claims are not identical but do overlap. The Med-IM/GEMSIT arbitration arises out of the sales contract, which contains details as to the equipment characteristics and contains warranty terms. The Med-IM/Guarantors/GECC litigation arises out of the master security agreement, which contains the financing terms, but does not contain warranty clauses. Med-Im has asserted that both GECC and GEMSIT representatives made specific misrepresentations about the quality of the equipment and its ability to meet Med-IM's requirements. GECC argues that these alleged misrepresentations will be "readily separable" because they will be based on "different statements by each defendant." (Docket Entry No. 23 at 4–5). But the evidence in the record as to the alleged misrepresentations shows a closer relationship than GECC describes. Brooks's affidavit asserts that the GECC representative made the same misrepresentations as to the quality and capabilities of the equipment as the GEMSIT representatives. (Docket Entry No. 30, Ex. B).

18

In the litigation with GECC, Med-IM and the guarantors seek to invalidate their obligations to GECC in part on the basis of the misrepresentations made as to the equipment and as to the parties providing the equipment and the financing.  (Docket Entry No. 31).  In the arbitration, Med-IM seeks damages for breach of contract in part on the basis that the equipment did not function as represented.  The operative facts are not identical and the claims are not "inherently inseparable" claims, but the facts and claims significantly overlap. The first two *Waste Management* factors do not appear to require a mandatory stay, but do argue in favor of a discretionary stay.  Such a stay will allow GEMSIT and Med-IM to arbitrate the issues relating to the representations about, and the quality of, the equipment before GECC and Med-IM litigate the financing-agreement issues, which will involve much of the same evidence developed in the arbitration.

The likely impact of the litigation on the arbitration provides another basis for a discretionary, if not a mandatory, stay.  The arbitration should be faster and more efficient than the litigation, given the relatively limited discovery available and the ability to avoid prolonged motions practice, if the party seeking the arbitration pursues it vigorously.  But if this litigation proceeds faster than the arbitration, the risk identified in *Waste Management* could arise.  If, for example, this court rules in advance of the arbitration on the enforceability of the master security agreement against the misrepresentation claims asserted by Med-IM, that could impact Med-IM's ability to have the arbitrator decide whether the misrepresentations occurred as allege.  If the parties seek discovery in this case on the misrepresentations, beyond the discovery that would be available in arbitration, that could

also impact the parties' arbitration rights.  Although GECC asserts that the representations alleged against GEMSIT and GECC are separate and distinct, the only evidence as to those allegations shows that the same specific representations are attributed to both the GECC representative and the GEMSIT representatives.  (Docket Entry No. 30, Ex. B).

GECC urges that this court could avoid having the litigation impact the arbitration by careful docket management.  In this case, however, the effect of that docket management would likely be to delay the litigation until the arbitration is concluded.  In this respect, this case is distinguishable from this court's own prior decision in *Halliburton Energy Services, Inc. v. NL Industries, Inc*., No. H-05-4160, 2007 WL 268492 (S.D. Tex. Jan. 26, 2007).  In that case, this court concluded that given the complicated and extensive discovery needed in the litigation, there was significant litigation work that could and should occur while the arbitration was pending that could be managed to avoid impacting the arbitration.  In that case, there was a contract provision insulating the arbitration from the litigation by making the litigation results inadmissible in the arbitration.  In this case, by contrast, the issues in both litigation and arbitration are more limited and closely related.  There is less opportunity for significant work in the litigation that would not be related to the arbitration.  In this case, the best way to avoid impacting the arbitration is to stay the litigation rather than  manage it to allow parts to proceed while other parts awaited the arbitration's outcome.

Imposing a discretionary stay on this litigation will enable the court and the parties to benefit from the outcome of the arbitration.  This effect does not weigh in favor of a mandatory stay under section 3, but does support a discretionary stay.  *See Waste*

20

*Management,* 372 F.3d at 343 ("The question is not ultimately one of weighing potential harm to the interests of the non-signatory, but of determining whether proceeding with litigation will destroy the signatories' right to a meaningful arbitration.").

GECC argues that as the plaintiff filing this suit, Med-IM is not entitled to have the litigation stayed while it is required to arbitrate with one of the parties it sued. (Docket Entry No. 23 at 8). The cases, however, do not distinguish between granting a stay sought by a plaintiff in the litigation on the one hand and a defendant in the litigation on the other. The factors that the Fifth Circuit identified in *Waste Management* do not include whether the party seeking the stay was the plaintiff or defendant in the litigation. The inquiry is ultimately aimed at assessing "whether proceeding with litigation will destroy the signatories' right to a meaningful arbitration." *Waste Management*, 372 F.3d at 343 .

GECC's primary argument against a stay is that its right to payment under the master security agreement should not be delayed. The delay will be minimized if the arbitration is vigorously pursued and efficiently conducted. And the litigation is likely to be expedited by the results of the arbitration, which will further reduce the delay that GECC fears. In sum, even if the factors set out in *Waste Management* do not require a stay under section 3, the factors support a discretionary stay.

**IV.     Conclusion**

Med-IM's motion to compel arbitration as to GECC is denied.  Med-IM's motion to stay this litigation pending the outcome of its arbitration with GEMSIT is granted.

SIGNED on March 31, 2008, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge